UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN KOZMA and WENDY KOZMA, as
Co-Guardians of JODI RENEE KOZMA,

      Plaintiffs,

v.

CITY OF LIVONIA, LIVONIA POLICE
DEPARTMENT, SGT. GIBBS, OFFICER
CAMMARATA, OFFICER SULLIVAN,
OFFICER SALTER, AND POLICE CHIEF
CURTIS CAID,

      Defendants.

Case No. 14-12268
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [30]**

---

Plaintiff Jodi Kozma is a mentally disabled woman in her 20s. When leaving a Walmart with her grandmother and cousin, Walmart asset protection employees confronted her and accused her of shoplifting. They reported to the Livonia police that they had her on video stuffing merchandise into her waistband. They said that Kozma was disruptive and uncooperative, and that she stated she was "special needs." Four Livonia police officers responded. They noticed a bulge in Kozma's waistband, but she refused to talk with them. Officers Salter and Sullivan thus tried to handcuff her. But she struggled, and they wrestled her to the floor. She stopped resisting, but an officer put his body weight onto her back while trying to cuff her, making it difficult for her to breathe. When the dust settled, it became clear that Walmart made a mistake: Kozma had not stolen anything.

Through her parent-guardians, Kozma sued the four officers. She claims that they violated her constitutional rights by arresting her without probable cause and using excessive

force. Before the Court is Defendants' Motion for Summary Judgment on all of Kozma's claims. (Dkt. 30, Defs.' Mot. Summ. J.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2). The Court finds that Kozma has raised a genuine issue of material fact concerning whether Salter and Sullivan used excessive force when they forced her to the ground and handcuffed her. But the officers are otherwise entitled to qualified immunity.

## I.

### A.

Jodi Kozma is a mentally disabled woman in her mid-20s with an IQ of around 50 to 60. (Dkt. 39, Pl.'s Resp. Ex. C, Evaluation.) She is under the guardianship of her parents. (Pl.'s Resp. Ex. T, Wendy Kozma Dep. at 25–26.)

On August 3, 2012, Kozma went shopping with her grandmother, Janice Dodd, and cousin, Jennifer Dodd, at a Walmart in Livonia, Michigan. (Pl.'s Resp. Ex. L, Janice Dodd Dep. at 32.) For around five to ten minutes, Kozma went off on her own to look for hair ties. (*Id.* at 15, 19.) Kozma and her grandmother got in line together and paid for their purchases separately. (*Id.* at 20–21.) Kozma bought hair ties for $3.87 and stickers for $3.00. (Pl.'s Resp. Ex. E, Receipt.)

When Kozma and her grandmother were about to leave the store with their cart, two male and one female "asset protection" employees from Walmart confronted them. (Pl.'s Resp. Ex. A, Video at 00:15.) The Walmart employees accused Kozma of shoplifting. (Janice Dodd Dep. at 25–26.) They thought they had seen in surveillance videos that Kozma had taken something from a shelf in the hair accessories aisle and stuffed it into the waistband of her pants. (Pl.'s Ex. P, Golinske Dep. at 138, 140, 144.) Kozma's grandmother lifted Kozma's shirt to show she did not take anything. (Pl.'s Ex. A at 1:19.) Kozma called her mother, Wendy Kozma, on a cell phone to

explain the situation, and she paced around while talking. (*Id.* at 1:52.) Once off the phone, Jodi lifted her shirt and tucked her phone into the waistband of her pants. (*Id.* at 4:09.)

During the confrontation with Kozma and her grandmother, one of the Walmart asset protection employees, Amanda Golinske, called the Livonia Police and spoke with Officer Nicholas Schroeder. (Defs.' Mot. Ex. P, Call.) In a recorded call, she told him, "We have a shoplifter that isn't cooperating. She's just screaming in the store. . . . We can't detain her, and she's claiming that she's special needs. We don't want to . . . put our hands on her, but she's out there right now flailing her arms around, screaming, yelling." (*Id.* at 0:08–0:25.) Schroeder asked, "And the retail fraud has been completed, correct?" (*Id*. at 1:05.) She replied, "Yes." (*Id.* at 1:07.) Schroeder also asked, "They are arrestable for retail fraud?" Golinske replied, "I'm not sure if it would be the prosecuting price.[1] I don't know how much she has on her, but I know that she's been taking things." (*Id.* at 1:18.) The recording also captures Golinske saying, "I had her on camera." (*Id.* at 1:47.) Golinske described Kozma as a 5'9" or 5'10" white female in her 20s, wearing a green shirt and black pants. (*Id.* at 1:59.) Golinske later told Schroeder, "She's walking back into the store now. She's not complying at all. . . .You did catch that she's special needs, right?" (*Id.* at 3:43.)

In response to Golinske's report, Schroeder put a call out to other officers concerning "a retail fraud at Wal-Mart North." (Pl.'s Mot., Ex. W, Schroeder Dep. at 61.) This part of the recording is not clearly audible. Around eight minutes after the Walmart employees first confronted Kozma, four uniformed and armed officers arrived at Walmart. (Pl.'s Ex. A at 8:25.) Sergeant John Gibbs arrived first, and three other officers—John Cammarata, Mark Salter, and

---

[1] Walmart generally only notifies the police of suspected shoplifting if more than $25 of merchandise is at issue. (Golinske Dep. at 100–101.)

Daniel Sullivan—followed within 30 seconds. (Pl.'s Ex. A at 8:56.) Gibbs came to find out that the alleged theft involved hair ties. (Pl.'s Resp. Ex. O, Gibbs Dep. at 83.)

When Gibbs first arrived, one of the Walmart employees told him (in a recorded conversation): "We have her grabbing one object and then go right into her waistband." (Defs.' Mot., Ex M, Audio at 18:23:12–18:23:38.) The Walmart employee also said that Kozma "kep[t] yelling" she is "special needs" but that he could not confirm that. (*Id.*) Gibbs approached Kozma's grandmother, walked with her slightly away from Kozma, and asked, "Can I speak to you, Grandma?" (Pl.'s Ex. A at 8:23; Defs.' Ex. M at 18:23:44.) Kozma herself grabbed her grandmother's phone from the shopping cart and tried to call her mother again. (Pl.'s Ex. A at 8:26.) Her grandmother told Gibbs that Jodi had been falsely accused of shoplifting and that the Walmart employees said they had her on video. (Janice Dodd Dep. at 30; Defs.' Ex. M at 18:23:53.)

While Kozma used her grandmother's phone, she left her own phone in her waistband. Officers therefore noticed a bulge in Kozma's waistband. (*See*, *e.g.*, Pl.'s Resp. Ex. K, Cammarata Dep. at 164.) So Gibbs asked, "What's in her waistband right now?" (Defs.' Ex. M at 18:24:02.) The video shows that Kozma's grandmother walked away from Gibbs to approach Kozma. (Pl.'s Ex. A at 8:49.) In recorded audio, Kozma said, "stop, please don't touch me," and it sounds like her grandmother said, "that's her phone." (Defs.' Ex. M at 18:24:14.) Gibbs then asked, "Whose phone is this?" (Defs.' Ex. M at 18:24:17.) Kozma's grandmother testified that she explained that Jodi's phone was in her waistband. (Janice Dodd Dep. at 30, 38, 74.) But officers were skeptical, as Kozma already had a phone in her hand. (*See* Pl.'s Resp. Ex. X, Sullivan Dep. at 96.)

4

The four officers then approached Kozma directly, and she backed away in response. (Pl.'s Resp. Ex. B, Video at 0:24.) Right after Gibbs asked, "Whose phone is this," Kozma said, "No, I'm special needs. I don't want to talk to you." (Defs.' Ex. M at 24:19; Gibbs Dep. at 81, 89.) Gibbs stopped moving toward her, and she "calmed down" momentarily. (Gibbs Dep. at 89.) Kozma then lifted her shirt up to her waistband very briefly. (Pl.'s Ex. B at 0:26.) As Gibbs did not know where the supposedly stolen merchandise was, he decided to take her to the asset protection office to search her, and he says he wanted her in handcuffs to avoid any further escalation. (Gibbs Dep. at 89–90.) So he ordered another officer to handcuff her. (Gibbs Dep. at 89.) The recording captures Gibbs saying, "Settle down. You don't have a choice but to talk to us. For now, put your hands behind your back." (Defs.' Ex. M at 18:24:23.) Kozma complied and put her hands behind her back. (Pl.'s Ex. B at 0:30; Gibbs Dep. at 95–96.) The decision to handcuff her came roughly six seconds after the officers approached Kozma directly, and less than a minute after Gibbs first arrived in the store. (Pl.'s Ex. B at 0:24–0:30; Pl.'s Ex. A at 8:56.)

At some point, Kozma's grandmother tried to show the police the receipts for the hair ties. (Pl.'s Resp. Ex. Q, Graves Dep. at 66; Janice Dodd Dep. at 73.) But the record does not make clear when she did that. In any case, none of the officers looked at the receipt, in Janice's bag, or in Jodi's purse for the stolen items or proof of payment before arresting Kozma. (Janice Dodd Dep. at 73.)

## B.

After initially complying with Gibbs' request to put her hands behind her back, Kozma started to struggle with the officers. (Pl.'s Ex. B, at 0:29–0:39.) The audio recording reflects that within several seconds of Gibbs telling Kozma to put her hands behind her back, loud screaming followed for over a minute, but it is unclear whether it was Kozma's voice the whole time.

(Defs.' Ex. M at 18:24:29–18:25:30.) Gibbs is heard in the background at times saying, "we'll take care of it, don't interfere," and "settle down." (*Id.*)

Once Kozma's arms were behind her back, Officer Sullivan tried to grab ahold of her hands to handcuff her. (Pl.'s Ex. B at 0:34; Sullivan Dep. at 126.) She resisted, moving abruptly forward, away from Sullivan. (Pl.'s Ex. B at 0:36; Sullivan Dep. at 124; Pl.'s Resp. Ex. V, Salter Dep. at 102–103.) Sullivan and Salter then tried to secure her again. (Salter Dep. at 114; Sullivan Dep. at 129–30.) The video—though blurry—appears to show that Kozma struggled for a couple of seconds. (Ex. B at 0:38–0:41.) Then, for several seconds—though the view of her is obstructed by a pillar—she stood still with her hands behind her back, an officer holding her hands or arm from behind. (*Id.* at 0:41–49.)

Then she started to struggle again. Sullivan testified that one of Kozma's arms broke free and she "started swinging it in wide gesturing movements . . . flailing." (Sullivan Dep. at 129.) Other witnesses, including Kozma's cousin, agreed that at least one arm was "flailing." (Jennifer Dodd. Dep. at 14, 23; Salter Dep. at 125; Cammarata Dep. at 208.) Kozma herself testified, "All I remember was saying, whoa, don't touch me, don't touch me. So I went like this, like my hands went up like that and I just said don't touch me." (Pl.'s Resp. Ex. S, Jodi Kozma Dep. at 21.) While the video does not clearly show whether one or both arms "flailed," it does show that she squirmed from side to side as she moved toward the ground. (Pl.'s Ex. B at 0:49–0:55.)

Officers Salter and Sullivan admit that they took her to the ground intentionally. Salter testified and wrote in a report that they "muscled" her to the ground. (Salter Dep. at 115.) Sullivan also wrote in a report that they "muscled" Kozma to the ground. (Pl.'s Resp. Ex. D, Sullivan Statement.) But he later testified that they just "fell" to the ground unintentionally while trying to secure her. (Sullivan Dep. at 130, 137, 141.) Valeria Graves, a third party eyewitness,

said that the officers "manhandled her" and "threw her on the floor." (Graves Dep. at 15.) The video shows that at least one officer was in contact with her on the way down, which took roughly seven seconds. (Pl.'s Ex. B at 0:51–0:57.)

Once down, the officers and Kozma are not visible in the video, as a ledge obstructed the camera's view. But it appears that she was on the ground for roughly 45 seconds, at which point her torso becomes upright and visible again, with officers at her side. (Pl.'s Ex. B at 0:53–1:36.) Salter ultimately handcuffed Kozma while she was on the ground. (Salter Dep. at 114.) But as Janice Dodd testified, she saw "Jodi on the ground with this guy on her with his knees in her back. All his weight on her." (Pl.'s Resp. Ex. M, Jennifer Dodd Dep. at 41.) For his part, Salter did not recall putting his knee into her but said that doing so "wouldn't be an uncommon thing." (Salter Dep. at 115.) Kozma testified that while on the ground, she had trouble breathing and felt like she was going to die. (Jodi Kozma Dep. at 44.)

Sullivan and Cammarata wrote in their statements that Kozma continued to struggle on the ground until she was handcuffed. (Pl.'s Ex. D, Sullivan Statement, Cammarata Statement.) Graves, the bystander, testified, "[the officer] had their knee on her back to pin her down, to put on the handcuffs. . . . Because she was squirming. She wasn't refusing. It was that . . . she didn't understand." (Graves Dep. at 16, 23.) Salter recalled that once they brought her to the ground, "[t]here was no chance to resist at that point." (Salter Dep. at 128.)

On a use of force form, Officers did not check boxes indicating that the reason for force was "To Restrain for Subjects [sic] Own Safety," "Necessary to Defend Officer," or "Necessary to Defend Another." (Pl.'s Resp. Ex. F.) Instead, they wrote that the reason was that Kozma was "[i]nterfering with a police investigation." (*Id.*) Consistent with that, none of the officers

personally felt like they were in any danger. (Sullivan Dep. at 97; Gibbs Dep. at 109–110; Salter Dep. at 99; Cammarata Dep. at 152.)

## C.

From there, the situation calmed down—at least from a physical standpoint. The officers walked Kozma—with her hands cuffed behind her back—to Walmart's asset protection office. (Pl.'s Ex. B at 2:00.) The police refused to allow Kozma's grandmother to enter the office. (Jennifer Dodd Dep. at 46.) When Wendy Kozma arrived, she asked repeatedly to enter, and the officers initially refused her as well. (Wendy Kozma Dep. at 25.)

When the officers finally allowed Wendy Kozma into the room, she asked them to remove her daughter's handcuffs. (*Id.* at 30–31.) The officers refused. (*Id.* at 31.) But they eventually moved her cuffs from the back to the front. (Cammarata Dep. at 213–14.) Officers questioned Jodi about Walmart's allegations. (*See* Defs.' Ex. M. at 18:34:25.) They also reviewed the store's surveillance video and finally concluded that it did not reveal any crime. (Gibbs Dep. at 111–112.) Video of the questioning shows that the officers removed Jodi's cuffs entirely after around 12 and a half minutes of holding her in the loss prevention office and released her a couple of minutes later. (*See generally* Pl.'s Ex. I.)

Kozma claims she suffered from bruising and emotional harm as a result of the officers' force. (Pl.'s Ex. G, Photos; Wendy Kozma Dep. at 108–112.)

## D.

Kozma filed a five-count complaint on May 7, 2014 in Wayne County Circuit Court. (Dkt. 1–2, Compl.) Count I asserted excessive force and false arrest claims under § 1983 against the City of Livonia, the Livonia Police Department, and the following Livonia police officers: Sergeant Gibbs, Officer Cammarata, Officer Sullivan, Officer Salter, Officer Schroeder, and

Police Chief Curtis Caid. (Compl. ¶¶ 87–92.) Count II asserted an intentional infliction of emotional distress claim against the Livonia Defendants and several Walmart Defendants, including Walmart Stores Inc., and loss prevention employees Amanda Golinske, Amilcar Ireland, and Christopher Preston II. (Compl. ¶¶ 93–99.) Count III asserted assault and battery claims against the Livonia Defendants. (Compl. ¶¶ 100–107.) Counts IV and V asserted claims under the Michigan Persons with Disabilities Civil Rights against the Livonia and Walmart Defendants respectively. (Compl. ¶¶ 108–17.)

Kozma filed her first amended complaint on May 22, 2014, and the suit was removed to this Court on June 9, 2014. (Dkt. 1, Notice of Removal.) On August 13, 2014, this Court remanded Counts II, III, IV and V to Wayne County Circuit Court and limited discovery to the issue of qualified immunity. (Dkt. 13.) On August 26, 2014, Kozma filed a second amended complaint with only one count: her excessive force and false arrest claims under § 1983 against the Livonia Defendants. (Dkt. 17.) The parties stipulated to Officer Schroeder's dismissal on January 26, 2015. (Dkt. 25.) The remaining Livonia Defendants filed their motion for summary judgment on March 24, 2015. (Dkt. 30, Defs.' Mot. Sum. J.) The motion is fully briefed. (Dkts. 39, 44.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine

issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here Kozma. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.

Defendants argue that as a matter of law they are qualifiedly immune from Kozma's false arrest and excessive force claims. Qualified immunity shields the officers from suit if they "reasonably believe[d] that . . . [their] conduct complie[d] with the law." *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231.

To defeat a qualified immunity defense, "a plaintiff must establish (1) that the defendant violated a 'constitutional right' and (2) that the right 'was clearly established.'" *Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

**A.**

The Court begins with Kozma's false arrest claim. Starting with the first prong of qualified immunity, "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Webb v. United States*, 789 F.3d 647, 666 (6th Cir. 2015) (quoting *Voyticky v. Vill. of Timberlake,* 412 F.3d 669, 677 (6th Cir.2005)). "The Fourth Amendment standard for probable cause requires 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 333 (6th Cir. 2015) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)).

In *Boykin v. Van Buren Township*, 479 F.3d 444 (6th Cir. 2007), circumstances similar to this case gave rise to a finding of qualified immunity. Loss prevention employees at Meijer (a major retailer like Walmart) saw Boykin take a drill from the shelf and leave the store, but they failed to notice he had already paid for the drill while checking out for another purchase. *Id.* at 446. So they called the police and reported retail fraud. *Id.* at 447. Officers confronted Boykin at his home shortly thereafter. *Id.* They called Meijer to confirm that he was accused of taking a drill and called again to confirm there was "good retail fraud." *Id.* After some questioning, the officers handcuffed Boykin, took him into custody, and brought him to Meijer, where they ultimately realized Meijer's mistake and released him. *Id.* at 447–48. The Sixth Circuit affirmed the district court's conclusion that the officers had probable cause to arrest Boykin, holding that the officers "cannot be held liable—at least not on grounds of unconstitutionally arresting an individual without probable cause—for an error . . . wholly attributable to Meijer employees." *Id.* at 450.

11

The officers in this case similarly relied on information from the professional loss prevention staff of a major retailer. Walmart loss-prevention officer Amanda Golinske called the Livonia Police and told Officer Schroeder, "We have a shoplifter that isn't cooperating. She's just screaming in the store." (Defs.' Mot. Ex. P at 0:08.) Schroeder twice confirmed that the retail fraud was completed. (*Id.* at 1:07–1:18.) Golinske also described Kozma in detail. (*Id.* at 1:59.) The four Defendant officers therefore arrived on the scene understanding that Walmart had accused someone matching Kozma's description of retail fraud and that she was not complying with Walmart's staff. For instance, Sergeant Gibbs testified that he heard two radio transmissions including information that "there was a retail fraud," "the suspect was uncooperative and giving loss prevention a hard time," and "the accused was special needs." (Gibbs Dep. at 43; *see also* Cammarata Dep. at 64; Sullivan Dep. at 66, 68; Salter Dep. at 73–74; Pl.'s Resp., Ex. D. Salter Statement.)

Kozma claims that the information from Walmart was unreliable because this particular Walmart was a new store, meaning Defendants had no firsthand knowledge of the qualifications or training of the loss prevention employees there. (Pl.'s Resp. at 26.) Yet Kozma cites no authority to support this argument. Furthermore, the Court reasoned in *Boykin* that the officers' information did not lack the "indicia of reliability essential to support probable cause" because it was based on "first-hand information about a suspected theft at a major local retail store." *See Boykin*, 479 F.3d at 450. The Court noted that officers "presumably receive such calls with relative frequency, and there would have been no reason for them to doubt the veracity of the information they received, especially in light of the facts they were able to corroborate once they spoke with Boykin." *Id.*

Here, as in *Boykin*, the officers did corroborate some of Golinske's report before arresting Kozma. For one, as is clear from video footage, Kozma's physical appearance matched Golinske's description. Also, when Sergeant Gibbs first arrived at Walmart, another loss prevention employee told him: "We have her grabbing one object and then go right into her waistband." (Defs.' Ex. M at 18:23:12–38.) Gibbs then noticed, consistent with that report, that Kozma had a bulge in her waistband. (Gibbs Dep. at 114.) And finally, as soon as Gibbs inquired about the bulge, Kozma refused to talk to him. (Defs.' Ex. M at 24:19; Gibbs Dep. at 81, 89.) This lack of response to Gibbs' attempt at further investigation tended to corroborate Walmart's report that she was uncooperative. Thus, nothing in the record suggests that the information that Defendants relied on, though ultimately wrong, lacked "the indicia of reliability essential to support probable cause." *See Boykin*, 479 F.3d at 450.

Kozma's counsel attempts to undermine this corroboration by suggesting that Kozma's grandmother conclusively demonstrated before the arrest that the bulge in Kozma's waistband was a phone, not any stolen merchandise. (Pl.'s Resp. at 7, 26.) Granted, Kozma's grandmother testified that she "showed" Gibbs that the bulge in Kozma's waistband was from a phone. (Janice Dodd Dep. at 31, 38.) But Kozma had a phone in her hand, and it was not unreasonable for the officers to doubt that she had two. More important, probable cause was already established by that point. *See Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004) (observing that once probable cause is established, "an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused . . . [or] to give any credence to a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause" (internal quotation marks and citations omitted)).

Kozma also disputes that probable cause existed because of uncertainty surrounding whether the amount of money at stake surpassed the threshold at which Walmart would prosecute a retail fraud claim. (Pl.'s Resp. at 26.) But that makes no difference. Though Walmart generally only pursues retail fraud claims above $25, (*see* Golinske Dep. at 100–101), the police in Michigan are not so limited. A person is guilty of retail fraud in the third degree under Michigan law if she, "While a store is open to the public, steals property of the store that is offered for sale at a price of less than $200.00." Mich. Comp. Laws Ann. § 750.356d(4)(b).

Finally, Kozma argues that the officers lacked probable cause because a "receipt was offered, and ignored." (Pl.'s Resp. at 27.) Kozma thus contends that this case is entirely distinguishable from *Boykin* because Boykin tried to find a receipt but was unable to produce it. (*Id.* at 28.) The Sixth Circuit indeed noted that Boykin's failure to provide a receipt corroborated the retailer's report of retail fraud, supporting the officers' probable cause determination. *Boykin*, 479 F.3d at 450. But a careful reading makes clear that the police had already handcuffed Boykin by the time it became apparent that he could not produce the receipt. *Id.* at 447–48. And in this case, though testimony indicates that Kozma's grandmother tried to show the police the receipt, (*see* Graves Dep. at 66; Janice Dodd Dep. at 73), nothing establishes when this happened. Even if Janice Dodd tried to show the police a receipt prior to the arrest, the officers would have had no obligation to ignore the possibility that Kozma had stolen something else. *See Williams*, 370 F.3d at 637.

In short, no reasonable jury could find that the officers lacked probable cause to suspect that Kozma had committed retail fraud. The officers received a firsthand report of shoplifting from a major retailer, which they partially corroborated when they arrived on the scene. Yes, they were ultimately proved wrong. But this Court does not evaluate whether officers had

14

probable cause to arrest with "the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005). Kozma has therefore failed to meet her burden to raise a genuine issue of material fact under the first prong of qualified immunity for her false arrest claim.

As for the second prong of the qualified immunity analysis, even if Kozma raised a fact issue concerning whether the officers falsely arrested her, she has not demonstrated that their conduct violated clearly established law. Other than saying in conclusory fashion that the arrest violated clearly established law because it was unsupported by probable cause, Kozma has done nothing to attempt to meet her burden under the second prong. (*See* Pl.'s Resp. at 25, 35.) Her entire qualified immunity argument rests on her emphasis that "[i]n a § 1983 action, the existence of probable cause is a question of fact." (Pl.'s Resp. at 25 (quoting *United States v. Gaudin*, 515 U.S. 506, 521 (1995).) But under the second prong, "[t]he reasonableness of an officer's probable cause determination is a question of law." *See Goodwin v. City of Painesville*, 781 F.3d 314, 333 (6th Cir. 2015) (citing *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993).

 "[T]he Supreme Court has made clear that the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *See Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes*, 799 F.3d at 610 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). However, "government officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Baynes*, 799 F.3d at 611. Still, it is the plaintiff's burden "to demonstrate that the government official violated a right that was so clearly established 'that every 'reasonable official would have understood that what he [was] doing

violate[d] that right.'" *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2083 (2011)).

The Court has been given no basis to find that every reasonable officer should have understood that it violated the Fourth Amendment to arrest someone based on a partially corroborated report of shoplifting from the professional loss prevention staff of a major retailer. If anything, *Boykin* suggests that doing so is *not* a violation of clearly established law. And Kozma cites nothing to the contrary. Thus, for Kozma's false arrest claim, she has failed to meet her burden under both qualified immunity prongs. The Court therefore finds that Defendants are entitled to qualified immunity as a matter of law for Kozma's false arrest claim.

### B.

Just because officers had cause to arrest Kozma does not mean that the force they used to carry out that arrest was reasonable: "The Fourth Amendment prohibits the use of excessive force during the seizure of a free citizen." *See Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997). When analyzing excessive force claims, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The "proper application" of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Kozma claims that the officers used excessive force when they forced her to the ground, and once down, when an officer put a knee into her back to restrain her while handcuffing her. (Pl.'s Resp. at 33–34.)

16

Beginning with the first qualified immunity prong, while Kozma discusses *Graham's* excessive force factors only in the segment of her brief addressing her false arrest claim, it is clear that the first two *Graham* factors weigh in her favor. First, when the officers attempted to handcuff her, they suspected she was guilty of a non-violent misdemeanor—retail fraud. (Gibbs Dep. at 83.) Second, though Walmart employees described her as "yelling" and "screaming" before officers arrived, no evidence suggests that she threatened the safety of the officers or anyone else. The officers themselves unanimously agreed that she did not. (Sullivan Dep. at 97; Gibbs Dep. at 109–110; Salter Dep. at 99; Cammarata Dep. at 152.) The final *Graham* factor— whether Kozma actively resisted officers' attempts to handcuff her—is not clearly in her favor.

Kozma's counsel claims that Jodi was "compliant and not-resistive" and that "no one has asserted there was a basis for *any* force at the moment of the takedown, given Jodi's total lack of resistance." (Pl.'s Mot. at 33 (emphasis in original).) Plaintiff's counsel suggests that Kozma was "just standing there" before officers suddenly threw her to the ground. (Pl.'s Mot. at 33.) In particular, she relies on Officer Salter's stray remark that once he grabbed Kozma's arm, and Sullivan had her other arm, she was "[j]ust standing there, or still going to the ground." (Salter Dep. at 116–117.) But taken in the context of his testimony, this statement does not support the inference that officers wrestled a totally compliant Kozma to the ground. For instance, Salter also testified that before they took her to the ground, "she took like a step away and started swinging her arms." (Salter Dep. at 125.) This is consistent with the testimony of other witnesses who described this portion of the events in detail—including Kozma's cousin. All agreed that Kozma swung one or both arms. (Sullivan Dep. at 129; Jennifer Dodd. Dep. at 14, 23; Cammarata Dep. at 208.) Kozma herself testified, "All I remember was saying, whoa, don't touch me, don't touch

17

me. So I went like this, like my hands went up like that and I just said don't touch me." (Jodi Kozma Dep. at 21.)

As for the video evidence, for a few seconds, it indeed shows that Kozma was "just standing there" before she went to the ground, with an officer holding her from behind. (Pl.'s Ex. B at 0:41–0:49.) But immediately before, she had stepped away, apparently refusing to be handcuffed. (*Id.* at 0:36–0:39.) And immediately after, while the video does not clearly show whether she swung one or both of her arms, she did continue to struggle, twisting and turning as she ultimately went to the ground with the officers. (*Id.* at 0:49–0:55.)

Kozma also cites Graves' testimony that Kozma "wasn't trying to fight them." (Graves Dep. at 23.) But testimony that she did not try to *fight* the officers does not undermine the irrefutable evidence that she refused to cooperate with the officers. One does not have to fight an officer to resist actively: "Active resistance includes physically struggling with, threatening, or disobeying officers." *See Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). It also includes "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Id.* at 641 (citing *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012)).

Kozma also asserts that Gibbs testified that she "never resisted arrest." (Pl.'s Resp. at 12.) But this is the testimony she cites:

Q: Jodi never resisted arrest because she was never told she was being arrested; correct?

Mr. Goldstein: Object to the form.

A. Correct.

(Gibbs Dep. at 110.) Kozma's counsel did not simply ask whether Kozma resisted. She asked a compound question: whether Kozma resisted *arrest because she was never told she was being*

*arrested*. It is unclear which part of that question Gibbs confirmed by saying "correct." Moreover, Gibbs testified that he did not even witness the full struggle: "The only thing I could notice is—when I turned to the grandmother and I was talking to her . . . I noticed out of my peripheral vision off to my right . . . that they fell to the floor." (Gibbs Dep. at 103.)

Because it is clear that Kozma did not willingly allow herself to be handcuffed, the question becomes whether it was reasonable for officers to force her to the ground and then put a knee into her back her while she was down. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *See Graham*, 490 U.S. at 396 (internal quotation marks and citations omitted). As such, Courts have found that it is not necessarily unreasonable to force a resisting suspect to the ground to apply handcuffs. *See Thacker v. Lawrence Cty.,* 182 F. App'x 464, 472 (6th Cir. 2006) (holding that it was not excessive force for two officers to take to the ground "an upset, loud, and swearing individual who refused to calm down" when trying to handcuff him); *see also Ezell v. Malczewski*, No. 06-14994, 2007 WL 3037723, at *6 (E.D. Mich. Oct. 17, 2007) (holding that it was not excessive force to use a "straight-arm-bar take down" technique to bring resisting suspect to the ground to handcuff him).

Kozma attempts to characterize the officers' conduct as unreasonable by saying that they "threw" her to the ground. (Pl.'s Mot. at 13, 32, 33.) This stems from Graves' testimony: "They threw her down. And that's what I call—I call that throwing down. . . . And not just pushing a person down. . . . They manhandled her like a male. . . . And threw her down." (Graves Dep. at 69.) While Defendants dispute that the video supports this testimony, the video is not entirely inconsistent with idea that the officers threw—or least slammed—Kozma to the ground. The video appears to show that it took roughly seven seconds of struggling for the officers to bring

Kozma totally to the ground.  (Pl.'s Ex. B at 0:51–0:57.) But once she was half-way down, the level of force the officers used to bring her all the way down is not clear from the video; a ledge blocked the camera's view. So the video does not foreclose the possibility that Graves' testimony was accurate. Kozma also suffered some bruising as a result of this incident, suggesting that the officers were less than gentle with her. (*See* Pl.'s Ex. G, Photos.) Even in their own words, they "muscled" her to the ground. (Salter Dep. at 115.)

Kozma further asserts that "In addition to throwing [her] to the ground with such force as to bruise her body, . . . the Defendants used knees and body pressure to asphyxiate her on the ground" at a time when she was "non-resistant." (Pl.'s Resp. at 34.) Though it is clear that Kozma did not willingly allow herself to be handcuffed before officers forced her to the ground, once they had her on the ground, drawing all inferences in her favor, she no longer resisted at all. While this portion of the confrontation does not appear in the video, even the officers' testimony supports the conclusion that Kozma no longer resisted once she was down. Salter confirmed that she just laid there and "[t]here was no chance to resist at that point." (Salter Dep. at 126, 128.) Similarly, Cammarata said she was "for the most part" compliant. (Cammarata Dep. at 209.) Graves additionally said that though Kozma was "squirming," she "wasn't refusing." (Graves Dep. at 23.)

Despite Kozma's non-resistance at this point, a reasonable jury could conclude that the officers applied significant pressure to her back. Her grandmother said that she saw "Jodi on the ground with this guy on her with his knees in her back. All his weight on her." (Jennifer Dodd Dep. at 41; *see also* Graves Dep. at 16.) Though the record is not clear, this was likely Salter. He acknowledged that he handcuffed Kozma, and though he did not recall putting a knee into her back, he also did not deny it. (Salter Dep. at 114–15.) As a result of this pressure to her back,

Kozma had trouble breathing and felt like she was going to die. (Jodi Kozma Dep. at 44.) And as the video implies that Kozma was on the ground for over forty seconds, (Pl.'s Ex. B at 0:53–1:36), a reasonable jury could conclude that neither the amount nor the duration of the force were insignificant.

Consider also that officers are required to "de-escalate the situation and adjust the application of force downward" when confronted with a mentally disabled person. *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013). Here, a reasonable jury could find that the officers did not. That would further call into question the reasonableness of their actions, especially considering that none of the four armed officers viewed Kozma as a threat.

In sum, the undisputed record establishes that Kozma offered some resistance to the officers, at least at first. But given the admittedly minimal threat that the unarmed Kozma posed, the number of officers involved, and the evidence before the officers concerning Kozma's mental disability, there is a genuine issue of material fact concerning whether the officers' reaction—throwing or muscling her to the ground and then applying pressure to her back—was an unreasonable use of force in the circumstances of this case.

Moving to the second prong, a finding that the officers' force was unreasonable in these circumstances would support the conclusion that their conduct violated clearly established law. The Fourth Amendment guarantees the "right of an unarmed, minimally threatening, and mentally unstable individual to be free from gratuitous violence during an arrest." *Martin v. City of Broadview Heights*, 712 F.3d 951, 960 (6th Cir. 2013); *see also Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."). If a jury finds that the officers manhandled and muscled Kozma to the ground when she

posed no threat—in circumstances that due to her mental disability warranted de-escalation instead—that would qualify as gratuitous force.

Kozma also had a clearly established right to be free from the force that she claims the officers used once they had her on the ground: a knee into her back, making it difficult for her to breath despite her non-resistance at that point. *See Sweatt v. Doxtader*, 986 F. Supp. 2d 886, 898 (E.D. Mich. 2013) ("[I]t was clearly established as of May 24, 2010, that a suspect had the right to be free from being forcibly kneed in the back while not actively resisting arrest and lying on his stomach on the ground not resisting arrest."). Defendants take issue with Kozma's characterization of what happened as "asphyxiation." (Dkt. 44, Defs.' Repl. at 9.) But even if Kozma's trouble breathing did not amount to actual asphyxiation, the Sixth Circuit noted in *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004), that it is "clearly established *that putting substantial or significant pressure on a suspect's back* while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." (emphasis added.); *see also Griffith v. Coburn*, 473 F.3d 650, 659-60 (6th Cir. 2007) (holding that the use of a neck restraint on a mentally ill arrestee who posed no threat "violate[d] a clearly established constitutional right to be free from gratuitous violence during arrest and is obviously inconsistent with a general prohibition on excessive force"). Here, a reasonable jury could find that officers put "significant pressure" on Kozma's back when she was no longer resisting.

Accordingly, the officers who used force—Sullivan and Salter—are not entitled to qualified immunity for Kozma's excessive force claim. Sergeant Gibbs and Officer Cammarata will be dismissed, however, as Kozma has failed to respond to Defendants' argument that they should not be individually liable because they were mere bystanders (*see* Defs.' Mot. at 38). *See*

*McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

## IV.

For the reasons stated, the officers are entitled to qualified immunity as a matter of law for Kozma's false arrest claim. However, Kozma has a raised a genuine issue of material fact as to whether Officers Sullivan and Salter are entitled to qualified immunity for her excessive force claim.

Accordingly, Defendants' Motion for Summary Judgment (Dkt. 30) is DENIED as to Sullivan and Salter for Plaintiff's excessive force claim in Count I but GRANTED as to Sullivan, Salter, Cammarata, and Gibbs in all other respects. As there is a genuine issue of material fact concerning whether a constitutional violation occurred, pursuant to the Court's order limiting preliminary discovery (Dkt. 13), discovery may now proceed to Kozma's *Monell* claims against the City of Livonia and Police Chief Caid.[2]

SO ORDERED.


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE


Dated:  December 9, 2015

---

[2] Kozma has also sued the Livonia Police Department, but that claim is more appropriately covered by her claim against the City of Livonia. *See Haverstick Enterprises, Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 997 n.1 (6th Cir. 1994) ("A suit against a city police department in Michigan is one against the city itself, because the city is the real party in interest."); *see also Laise v. City of Utica*, 970 F.Supp. 605, 608 (E.D.Mich.1997) ("[T]he police department is not a legal entity against whom a suit can be directed."). Thus, the Livonia Police Department is dismissed from this case as a Defendant.

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 9, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson